**SO ORDERED.**
**SIGNED July 13, 2020.**

_____
**JOHN W. KOLWE**
**UNITED STATES BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

In re:                                              Case No. 19-51077

Clay G. Plaisance                          Chapter 11
                         *Debtor*
                                                    Judge John W. Kolwe

### RULING ON OBJECTION TO CLAIM NO. 3

The Court held a hearing on the Debtor's Objection to Proof of Claim of nThrive Reimbursement Management (Claim No. 3) (ECF #62), at which both parties presented evidence and testimony regarding both the validity of Claim No. 3 and the amount of damages. The parties also filed post-hearing briefs. The Court is now prepared to rule on the validity and amount of the claim.[1]

### BACKGROUND AND ISSUES PRESENTED

The Debtor, Clay G. Plaisance, owned and ran a few companies that performed a variety of services for hospitals, including collections and Medicaid eligibility

---

[1] The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

screening of patients. The parent company was HCR Financial Group, L.L.C., which controlled two subsidiaries, HCR HealthCare Resources, L.L.C. and Pinnacle Healthcare Group of Louisiana, L.L.C. (collectively, "HCR"). By 2015, these companies had been in business for years and had a number of clients, including Willis Knighton Health System ("Willis Knighton") and Baylor Scott & White Texas Spine and Joint Hospital ("Texas Spine"). Early in 2015, HCR entered into an Asset Purchase Agreement with nThrive Reimbursement Management, LLC, formerly known as Advanced Reimbursement Management, LLC d/b/a Adreima (hereinafter "Adreima"), as well as several related agreements, all pertaining to the Debtor's sale of the businesses to Adreima. Each agreement contains virtually identical covenants not to compete, which would prevent the Debtor from competing with Adreima for up to five years.

In 2017, approximately two years after the sale, Willis Knighton and Texas Spine, either partially or fully terminated their services with Adreima because they opted to switch to a new competitor of Adreima, Avail Revenue Solutions, LLC ("Avail"), which had recently been founded by former employees of Adreima. Believing Avail to be owned and operated by the Debtor, Adreima sued the Debtor and a number of other entities in Delaware, alleging the Debtor breached the non-compete agreements he executed in connection with the 2015 sale. Due to the high cost of litigation and the potential damages at issue in the suit, the Debtor filed for bankruptcy protection on September 11, 2019. Adreima timely filed a claim in the bankruptcy case. The Debtor and a company 100% owned by him, CGP Management, Inc. ("CGP"), objected to the claim. Because the parties' positions have changed substantially over the course of this dispute, the Court will summarize the parties' positions set out in the filings leading up to the hearing on the Objection.

<u>Adreima's Claim</u>

Adreima's $11,271,196.00 Proof of Claim ("POC") relies on a September 10, 2019 opinion letter by Richard Szekelyi of Phoenix Corporate Recovery (the "Phoenix Letter"), which opines on potential damages in the Delaware federal court lawsuit filed by Adreima against the Debtor, Kirby Plaisance ("Kirby"), and entities

2

owned/controlled by the Plaisances: TKC Works, LLC f/k/a HCR Healthcare Resources, LLC, and TKC Plaisance, LLC f/k/a Pinnacle Healthcare Group of Louisiana, LLC. The Phoenix Letter refers to documents that are not attached to the POC, and both parties agree that because the relevant documents are not attached to the POC, Adreima is required to prove the validity and amount of its claim in this contested matter.[2]

The Phoenix Letter claims that the Debtor and Kirby, through their wholly owned companies CGP Management, Inc. and KDP Management, Inc., were equity holders of HCR, which Adreima acquired in 2015 pursuant to a February 10, 2015 Asset Purchase Agreement (Adreima Exh. #1). At the same time, the Debtor and Kirby each entered into a five-year Restrictive Covenant Agreement (Adreima Exh. #4) that included a non-compete provision, a non-solicitation of business associate provision, a non-solicitation of customer provision, and a non-disparagement provision (together, the "restrictive covenants"), as well as a February 10, 2015 Goodwill Purchase Agreement (Adreima Exh. #3) and a two-year Consulting Agreement dated February 10, 2015 (Adreima Exh. #2) that contained similar covenants.

For reference, the restrictive covenants set out in Sections 2.2 and 2.3 of the Restrictive Covenant Agreement, which are similar to the covenants in the other two agreements, read:

> **2.2 Non-Competition.** During the Restricted Period [defined in Section 4.1 to mean five years or the longest allowable period under law, but this period is two years under the Consulting Agreement and up to four years under the Goodwill Purchase Agreement], each Restricted Party will not, directly or indirectly, own, manage, operate, join, control, finance or participate in, or participate in the ownership, management, operation, control or financing of, or be connected as an owner, investor, partner, joint venturer, director, limited liability company manager, officer, employee, independent contractor, consultant or other agent of, any Person or enterprise (other than the

---

[2] See In re Brunson, 486 B.R. 759, 759, 769 (Bankr. N.D. Tex. 2013).

Purchaser Group) that is engaged in any Competing Business anywhere in or with respect to the Restricted Territory [defined in Section 4.1 to mean the United States of America]; *provided, however, that* nothing in this Section 2.2 will prohibit the Restricted Parties and their Affiliates from owning, in the aggregate, less than 1.0% of any class of securities of a publicly traded Person so long as none of the Restricted Parties and their Affiliates participates in any way in the management, operation or control of such Person.

**2.3 Non-Solicitation.** During the Restricted Period, each Restricted Party will not, directly or indirectly:

(a) solicit or induce, or attempt to solicit or induce (including by recruiting, interviewing or identifying or targeting as a candidate for recruitment), any member of the board of directors or similar governing body, officer, employee or independent contractor of any Purchaser Group entity who is acting in such capacity or acted in such capacity at any time within the 12-month period immediately preceding the date of such solicitation, inducement or attempt (a "Business Associate") to terminate, restrict or hinder such Business Associate's association with any Purchaser Group entity or interfere in any way with the relationship between such Business Associate and any Purchaser Group entity; *provided, however, that* general solicitations published in a journal, newspaper or other publication or posted on an internet job site and not specifically directed toward Business Associates will not constitute a breach of the covenants in this Section 2.3(a).

(b) hire or retain, or attempt to hire or otherwise retain the services of, any Business Associate as an employee, officer, director, independent contractor, licensee, consultant, advisor, agent or in any other capacity, or attempt or assist anyone else to do so, or

(c) interfere with the relationship between any Purchaser Group entity and any Person who is a customer, referral source, supplier, lessor, lessee, dealer, distributor, licensor, licensee, equityholder, lender, joint venturer, consultant, agent or any other Person having a business relationship with any Purchaser Group entity.

4

Restrictive Covenant Agreement (Adreima Trial Exh. 4), p. 2 (ECF #115-4) (emphasis in original).

Adreima claims, both in the Delaware lawsuit and the POC, that the Debtor owns and controls Avail and that the Debtor, through Avail, breached the restrictive covenants by taking two of Adreima's customers, Willis Knighton and Texas Spine, not long after the two-year consulting period terminated. Adreima also claims that the Debtor breached the covenants by hiring two key Adreima employees, Merwyn Landry and Sonia Hughes.

The Debtor's Objection (ECF #62)

The Debtor and CGP jointly objected to Adreima's claim, with the attorney for each party electronically signing the Objection. (Adreima has raised an objection to CGP's standing to join in the Objection, which the Court will address below; for purposes of this ruling, the Court will refer to the Objection as the Debtor's.) The Debtor claims that Adreima's factual basis was incorrect and that in reality Avail is *not* the Debtor's company but rather was a company formed by Landry (who had been fired by Adreima), and that it was Landry/Avail who solicited and hired Adreima employees, not the Debtor. While the Debtor originally reserved the Avail name with the Louisiana Secretary of State and forwarded an Avail logo to Landry, he claims the name reservation expired on May 6, 2017, and Landry assumed the Avail name on May 10, 2017 after Adreima fired him. The Debtor claims Adreima left all of that information out of the Delaware complaint and misrepresented the facts to make it appear as if the Debtor and Kirby did all of those things.

As to the Delaware lawsuit, it was originally filed in Delaware but was transferred to the Western District of Louisiana in September 2017, where Adreima filed a First Amended Complaint on October 11, 2017. Approximately one year later, the case was transferred back to Delaware, where Adreima filed the Second Amended Complaint on April 2, 2019. The Complaint, as amended, does not name Kirby as a defendant, and the Debtor claims it misrepresents many facts.

The Debtor claims that all the actions Adreima asserts the Debtor and Kirby took to breach the provisions of the various agreements were in fact done by former

5

Adreima employees, primarily Landry (the founder and 100% owner of Avail) and Hughes, not the Debtor and Kirby. The Debtor also claims that Willis Knighton decided to terminate its contract with Adreima primarily to reduce vendor expenses. In addition, the Debtor asserts that Adreima generally botched its customer service after it purchased the Debtor's businesses, which led to problems for Adreima's customers and a reduced payout to the Debtor. In the end, the Debtor claims that Adreima's lawsuit is baseless and drove him into bankruptcy.

In addition to the Debtor's factual challenges to Adreima's claim, he also asserts that the restrictive covenants, which the agreements purport to establish under Delaware law, are void under Louisiana law, specifically La. R.S. § 23:921 and the relevant choice-of-law statutes, La. Civ. Code arts. 3537 and 3540, because the covenants contain terms that are too long (up to five years rather than the maximum of two years allowed under Louisiana law) and include overly broad geographic restrictions (the entire United States rather than specified locations, as required by Louisiana law). The Debtor argues that the restrictive covenants must be nullified rather than being reformed.[3] This threshold question will be addressed below.

<u>Adreima's Response (ECF #89)</u>

In its Response, Adreima first attacks CGP's standing to file the Objection, an issue the Court will address separately below. As to the merits, Adreima, for the first time, asserts that the Debtor breached the covenants by financing a competitor. Adreima points out that the Debtor reserved the Avail name and communicated with Landry, then an Adreima employee who had previously worked for the Debtor's company (as well as a friend of the Debtor) regarding Avail's logo. Landry has admitted that he had discussions with the Debtor about forming a competitor to Adreima before being fired by Adreima, and Landry reserved the Avail name shortly after the Debtor's reservation expired.

---

[3] The Debtor also asserted that the Full Faith and Credit Clause precludes the parties from applying Delaware law in contravention of Louisiana public policy, an argument the Court will not address given the Debtor's failure to cite any relevant case law applicable to this situation and the fact that courts routinely apply the law of other states in appropriate circumstances.

6

Adreima also claims the Debtor provided Landry with an undocumented $250,000 startup loan, with no interest and no repayment terms, after Landry told the Debtor that he intended to form a competitor to Adreima.[4] Adreima claims that this loan, which was used to fund a competitor, violates the covenant against financing a competitor. Furthermore, Adreima contends, the Debtor deposited funds into Avail's accounts "three to four times" during the period from June 2017 (when Avail was officially formed) to February 2018 to help Avail make payroll. Adreima claims these cash infusions were necessary to save Avail and therefore also violate the covenant not to finance a competitor.

Adreima's Response offers few facts suggesting that the Debtor himself competed against Adreima, hired away Adreima's employees, or otherwise violated the typical provisions found in non-compete and non-solicitation agreements, which was Adreima's theory in both the Delaware suit and the POC prior to its Response to the Debtor's Claim Objection. For example, with respect to Willis Knighton and Texas Spine terminating Adreima's services and moving to Avail, Adreima concedes: "Although there has not been evidence of the Debtor's contacts with these customers after he left Adreima, these customers ended up at Avail at or near the time that the Debtor was still providing direct cash payments to keep Avail in operation. This is the very essence of why non-competes exist." (ECF #89, p. 9). Essentially, Adreima's response offers very little facts supporting its original theory that the Debtor directly competed against Adreima or personally solicited Adreima customers, but it points to facts strongly suggesting that the Debtor at least financed Avail, a competitor of Adreima.

With respect to the Debtor's argument that the non-compete and non-solicitation covenants should be nullified under Louisiana law, Adreima argues that these particular provisions, arising in connection with the sale of a business rather than in an employment contract, are valid under Delaware law, and the parties were

---

[4] The Debtor did not disclose this loan in his schedules. At the hearing, Landry said he repaid a portion of the loan.

free to choose Delaware law under the circumstances. Thus, Adreima argues, the covenants should be enforced.

Although the Debtor's Objection did not focus on the amount of damages but rather on whether Adreima had any basis for its claim, Adreima nonetheless briefly addresses damages at the end of its Response, focusing on the lost business due to the Debtor's alleged violations of the non-compete agreements. Adreima's expert in the Delaware lawsuit, Richard Szekelyi, simply took the past annual profits of the two defecting customers, Willis Knighton and Texas Spine, and he assumed that the customers would have remained with Adreima in the future for as long as they had been customers in the past but for Avail's actions. Szekelyi opined that the loss of the Willis Knighton business cost Adreima $7,571,842 in future lost profits, and the loss of Texas Spine cost Adreima $2,642,697.

Adreima also claims the Debtor must return the $300,000 he received under the Goodwill Purchase Agreement and the $148,000 he received from the Consulting Agreement, on the ground that the Debtor violated the non-competition covenants in them. Adreima also seeks unspecified "hundreds of thousands of dollars" in attorney's fees as allowed by a provision in the Consulting Agreement. Altogether, Adreima claims its damages exceed $10 million. As noted above, Adreima bears the burden of proving the validity of its claim, including the amount of damages, at a hearing.

<u>The Debtor's Reply (ECF #96)</u>

In his Reply, the Debtor addresses some of the same arguments as before, including the Louisiana choice-of-law. Most importantly, the Debtor addresses Adreima's apparently new theory that rather than directly compete with Adreima, the Debtor had financed a competitor in violation of the restrictive covenants. The Debtor argues that the loan he provided to Landry was not "financing a competitor" but was instead consistent with a years-long pattern of providing personal loans to Landry as a friend, and that the Debtor never took any interest in Landry's business, never received income from Avail, and otherwise did not get involved in Landry's business. Furthermore, the Debtor argues that his loans to Landry for Avail's startup occurred more than two years after the execution of the various sale-related

8

documents, beyond Louisiana's maximum period for non-compete agreements. Thus, if Louisiana law applies to either nullify the restrictive covenants or reform them to the maximum limits of Louisiana law, the Debtor's loans to Landry could not possibly breach the agreements.

<u>CGP's Standing</u>

As a preliminary matter, the Court will address the procedural issue of CGP's standing to file the Objection. Adreima argues in its Response that CGP lacks standing to object to Adreima's claim on the grounds that CGP is not a party in interest under 11 U.S.C. § 1109, which defines "party in interest" (i.e., a party who "may raise and may appear and be heard on any issue in a case under this chapter") to "include[] the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109(b).[5] Adreima correctly summarizes the law in its brief as follows:

> This list is not exclusive, but at a minimum, a party in interest must have "a legally protected interest that could be affected by the bankruptcy case." *In re Xenon Anesthesia of Tex., P.L.L.C.*, No. 13-37697, 2016 Bankr. LEXIS 2747, *4 (Bankr. S.D. Tex. Jul. 27, 2016). A party may object in a bankruptcy proceeding "if that [party] can demonstrate that the order diminishes the [party's] property, increases the [party's] burdens, or impairs the [party's] rights." *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 693 (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)).
>
> However, a party does not have standing "to assert . . . objections that relate solely to others, or that go to issues that do not directly and adversely affect them pecuniarily." *In re Simplot*, No. 06-00002, 2007 Bankr. LEXIS 2396, *33–34 (Bankr. D. Idaho Aug. 28, 2007) (holding that a company that a Debtor owned stock in lacked standing to object to the confirmation of a plan when it was not also a creditor). Similarly, in *Khan v. Xenon Health, L.L.C. (In re Xenon Anesthesia of Tex., P.L.L.C.)*, 793 F. App'x 793, 794

---

[5] The estate could not hire CGP's attorney under 11 U.S.C. § 327 because he has a claim against the estate and therefore is not disinterested. There is no actual conflict of interest presented in this case, however, because the interests of the Debtor, CGP, and CGP's attorney are all aligned against Adreima.

(5th Cir. 2017) (unpublished) (per curiam), the Fifth Circuit held that a party lacked standing to object to a proof of claim where the party had transferred all of its ownership interest in the debtor prior to the hearing of [sic] the objection.

Adreima's Response, pp. 12-13 (ECF #89).

Adreima claims that not only does CGP fail to meet the standard for being a party in interest under § 1109, but also that the entire Objection should be stricken because "[o]nly CGP's attorney signed the Objection." *See* Adreima's Response, p. 13 (ECF #89). The Court will immediately reject the latter argument because the Objection was electronically signed (with "s/" signatures) by both the Debtor's attorney and CGP's attorney, and the Debtor maintains that the Objection was jointly filed. Western District of Louisiana LR 5.7.08 provides, in relevant part:

> Documents requiring signatures of more than one party must be electronically filed either by: (1) submitting a scanned document containing all necessary signatures; (2) indicating the consent of the parties who did not electronically file the document. Consent may be indicated by the filer by including an "s/ and the name of the consenting attorney(s)" on the document to be filed electronically (e.g. "S/John Doe," "s/Jane Smith," etc.). By using "s/ and another attorney's name" the filing attorney certifies that each of the other signatories has expressly agreed to the form and substance of the document and that the filing attorney has their actual authority to submit the document electronically.

LR 5.7.08.

Because the Debtor's attorney electronically signed the Objection (ECF #62), the Reply (ECF #96), and the Post Trial Brief (ECF #99) in accordance with the local rule and has affirmed his intent to file them on behalf of the Debtor, the Court must conclude that all of these filings would be properly before the Court even if CGP's involvement were terminated on the ground that it is not a party in interest under § 1109. Thus, regardless of CGP's standing to join in with the Debtor, all of the legal and factual issues are properly before the Court.

10

The only practical effect that CGP's involvement had on these proceedings is the identity of the attorney questioning witnesses at the January 28, 2020 hearing. The Debtor's attorney largely handled the hearing prior to the questioning of witnesses, including addressing Adreima's standing argument. After hearing argument from counsel for both Adreima and the Debtor regarding CGP's standing, the Court offered to take the issue under advisement and take up the merits at a future date. Counsel for both Adreima and the Debtor instead wished to proceed with the hearing on the merits. Thereafter, CGP's counsel conducted the questioning of witnesses.

If the Court were to conclude that CGP is not a party in interest, the remedy would not be striking the Objection (which, again, is properly before the Court because it was also signed by the Debtor's attorney) but, at most, holding the same hearing with the same witnesses and evidence, but requiring the questioning to be conducted by the Debtor's attorney. That remedy would seem to be a waste of time and resources for the Court, the parties, and the witnesses. It likely would have no effect on the outcome of this dispute but would impose additional costs on everyone, including the estate and, ultimately, creditors. Regardless of whether CGP is, in fact, a party in interest, the Court declines to essentially repeat the play with one role recast when that cannot change the outcome.

Although it is not necessary to determine whether CGP is a party in interest under the peculiar circumstances presented in this case, the Court is not convinced that CGP is not one. As the Debtor's attorney pointed out at the hearing, CGP is listed on the Debtor's schedules as an asset of the estate 100% owned by the Debtor. Adreima's asserted claim far exceeds the Debtor's total assets, and if Adreima's claim is successful, it is conceivable that the Debtor will have to liquidate his assets, including his interest in CGP. Because the outcome of Adreima's claim could potentially be fatal to CGP's existence, the Court cannot say that the outcome of this claim objection will not diminish CGP's property, increase CGP's burdens, or impair CGP's rights. *See In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 694 (Bankr. W. D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). Nevertheless, even if

CGP is not a party in interest, it would have no material difference on the outcome under these circumstances.

## CONCLUSIONS OF LAW: VIABILITY OF THE RESTRICTIVE COVENANTS

The Court must first decide whether the restrictive covenants are viable at all. If, as the Debtor contends, the covenants are void under Louisiana law as against public policy, then it would be impossible for the Debtor to have violated them, and the Court must sustain the Debtor's Objection and disallow Adreima's claim. If, on the other hand, the covenants are not nullified by Louisiana law and are viable under Delaware law, then the Court must determine whether the Debtor in fact violated any of the provisions and, if so, the amount of damages that Adreima sustained as a result.

All of the relevant February 2015 agreements—the Asset Purchase Agreement (ECF #115-1, Adreima Exhibit #1), Consulting Agreement dated (ECF #115-2, Adreima Exhibit #2), and Goodwill Purchase Agreement (ECF #115-3, Adreima Exhibit #3), contained similar restrictive covenants, including the prohibition against financing a competitor, applicable for a term of up to four or five years and covering the entire United States. All three agreements contained a choice-of-law clause selecting Delaware law without regard to its conflicts of laws rules, as well as a choice-of-forum clause selecting Delaware state or federal courts as the appropriate forum (except for the Goodwill Purchase Agreement, which did not include the choice-of-forum clause).

Louisiana generally allows parties to choose the applicable law unless that law violates public policy:

> All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

La. Civ. Code art. 3540. Article 3537 provides Louisiana's general conflicts of laws rules:

Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La. Civ. Code art. 3537. Article 3515 provides:

Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La. Civ. Code art. 3515.

The Debtor argues that Louisiana law has the most significant contacts with this dispute, because except for the fact that Adreima was incorporated in Delaware, all of the other entities involved, and the work to be performed, were located in Louisiana. Additionally, the Debtor points out that the Louisiana legislature has expressed a strong public policy regarding non-compete and non-solicitation agreements in La. R.S. § 23:921. Specifically, § 921 contains the following provisions:

13

> Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void. However, every contract or agreement, or provision thereof, which meets the exceptions as provided in this Section, shall be enforceable.

La. R.S. § 23:921(A)(1).

> Any person, including a corporation and the individual shareholders of such corporation, who sells the goodwill of a business may agree with the buyer that the seller or other interested party in the transaction, will refrain from carrying on or engaging in a business similar to the business being sold or from soliciting customers of the business being sold **within a specified parish or parishes, or municipality or municipalities, or parts thereof**, so long as the buyer, or any person deriving title to the goodwill from him, carries on a like business therein, **not to exceed a period of two years from the date of sale**.

La. R.S. § 23:921(B) (emphasis added).

Section 921(A) is a long-standing statutory provision governing the general rule for restrictive covenants, but § 921(B), governing restrictive covenants in the context of the sale of a business (the situation presented in this case) was added through a 1990 statutory amendment. Prior to the amendment, a number of courts had ruled that the general rules for restrictive covenants did not apply in the sale of a business.[6] The Debtor argues that the 1990 amendment changed the law and essentially showed that the Louisiana legislature had now expressed a strong public policy against restrictive covenants even in the context of the sale of a business, such that parties are not free to contract around § 921(B) by choosing to apply another state's law. Because the restrictive covenants at issue here exceed two years in length and apply to the entire United States rather than "a specified parish or parishes, or

---

[6] *See, e.g., Marshall Brown Ins. Agency, Inc. v. Toledano*, 292 So. 2d 266, 268 (La. Ct. App. 1974) (citing *Hirsh v. Miller*, 167 So. 2d 539, 542 (La. Ct. App. 1964); *accord Gold & Suckle, Inc. v. Suckle*, 335 So. 2d 713, 715 (La. Ct. App. 1976) and *Target Rental Towel, Inc. v. Byrd*, 341 So. 2d 600, 603 (La. Ct. App. 1977), all cited in the Debtor's Objection (ECF #62, pp. 45-46).

municipality or municipalities, or parts thereof," the Debtor contends that they are void as against Louisiana's public policy regarding restrictive covenants in connection with the sale of a business and therefore must be nullified, precluding any claim by Adreima for violating them.

There are a few problems with the Debtor's argument. First, the main case the Debtor cites, *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So. 2d 294 (La. 2001), addressed a restrictive covenant in a Louisiana employment contract, not in connection with the sale of a business, with the Supreme Court noting that "Louisiana has long had a strong public policy disfavoring noncompetition agreements **between employers and employees**," *id*. at 298 (emphasis added)).[7] Although the Debtor cites a few cases from both before and after *SWAT 24* which he claims demonstrates that this strong public policy would also apply in the context of the sale of a business, these cases do not involve a choice-of-law clause purporting to select the substantive law of another state, so they also do not address the question at issue in this case. *See Millett v. Crump*, 687 So. 2d 132 (La. Ct. App. 1997) (addressing a restrictive covenant in Louisiana contract to sell a business; no discussion of choice-of-law provision); *Chiasson v New Orleans Pub. Group, Inc.*, 761 So. 2d 89 (La. Ct. App. 2000) (same); *Aon Risk Services of Louisiana, Inc. v. Ryan*, 807 So. 2d 1058 (La. Ct. App. 2002) (same); *Herff Jones, Inc. v. Girouard*, 966 So. 2d 1127 (La. Ct. App. 2007) (same).

More problematic for the Debtor is the fact that at least two federal courts, including this Court, have addressed the issue presented here after the 1990 amendment to § 921(B) and have concluded that parties remain free to select the law of another state for restrictive covenants in connection with the sale of a business. In *MedX, Inc. of Florida v. Ranger*, 780 F. Supp. 398 (E.D. La. 1991), the district court concluded that the 1990 amendment adding § 921(B) "is a codification of jurisprudence that favors enforcement of noncompete covenants that are made in

---

[7] A later federal district court case cited by the Debtor, *Lobrano v. C.H. Robinson Worldwide, Inc.*, 2011 WL 52602 (W.D. La. Jan. 7, 2011), also concerned an employment agreement, not the sale of a business.

connection with the sale of a business." *Id.* at 400 (citing *Target Rental Towel, Inc. v. Byrd,* 341 So. 2d 600, 603 (La. Ct. App. 1977); *Hirsh v. Miller,* 167 So. 2d 539, 541 (La. Ct. App. 1964)). The *MedX* court declined to invalidate a restrictive covenant made in connection with the sale of a business even though it potentially exceeded the two-year statutory maximum under § 921(B), stating:

> Louisiana law gives effect to contractual choice of law clauses as a matter of course unless doing so would violate a strong public policy of the state. Because Louisiana law generally validates the category of noncompete covenant at issue here, it cannot be maintained that Louisiana law is gravely offended by the enforcement of such a covenant. Any argument to that effect would have the odd implication that a noncompete covenant of two years or less from the date of sale is entirely innocuous, while one of any greater duration violates a strong public policy. Accordingly, this Court finds that the exception for the sale of a business applies in this case.

*Id.* at 401. (The restrictive agreement was included in an employment agreement, but the *MedX* court concluded it was "an incident of and was ancillary to the sale," *id.*, so it was actually made in connection with the sale of a business.)

The Court also noted that the public policy in the context of the sale of a business, where parties typically negotiate at arm's length without coercion or adhesion, is different from the public policy in the employer/employee context, where "'the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away this liberty to earn his livelihood except by continuing in the employment of his present employer.'" *Id.* (quoting *Fine v. Property Damage Appraisers, Inc.*, 393 F. Supp. 1304, 1310 (E.D. La. 1975)). The *MedX* court held that Louisiana public policy, as expressed in § 921(B), did not apply to invalidate the parties' choice of Florida law with respect to interpretation of the restrictive covenant, and it also upheld the restrictive covenant under Florida law.

In *In re Gulf Fleet Holdings, Inc.*, 2011 WL 1313901 (Bankr. W.D. La. Mar. 31, 2011), this Court reached the same conclusion. In *Gulf Fleet*, the parties included a

16

Delaware choice-of-law clause in a purchase agreement, as well as a non-competition provision that the movant, Hillman, alleged violated § 921(B). (Hillman did not assert that the provision violated Delaware law, however.) This Court, relying on *MedX* and the cases cited therein, held that Louisiana public policy did not bar parties from selecting another state's law to apply to restrictive covenants in the context of the sale of a business, either as a matter of law or logic, because the parties to such an agreement typically negotiate at arm's length:

> The flaw in Hillman's public policy argument is that, unlike the *National Motor Club* or *Bell* cases, the choice-of-law clause and the non-competition provisions in the Purchase Agreement were executed in connection with the sale of a business for cash and other consideration exceeding $60 million. The long-standing policy concerns at play with respect to non-competition restrictions in employment contracts—unequal bargaining position and loss of livelihood—are not necessarily at play when the agreement at issue involves the sale of a business, even if, as here, the selling party later enters into a separate employment agreement. [citing and discussing *MedX*]

> * * *

> Here, like *MedX,* [the parties'] non-competition agreement was negotiated and executed in connection [with] the sale of a business and, accordingly, does not invoke the strong public policy interests that arise in cases involving solely an employee-employer relationship. Like *MedX,* absent strong public policy to the contrary, the Delaware choice-of-law clause governing the Purchase Agreement and the parties' non-competition agreement is enforceable under Louisiana Civil Code article 3540. *See also Sentilles,* 652 So.2d 79 (La.App. 4th Cir.1995) (enforcing choice-of-law provision in franchise agreement on the grounds that the franchisee's relationship with the franchiser was not an employee-employer relationship, thus making Louisiana's public policy against non-competition agreements inapplicable).

*Id*. at *6. The Court further noted that a 1999 amendment to § 921, adding § 921(A)(2), nullifies choice-of-law and choice-of-forum clauses only with respect to

employment agreements (except in specific situations), but the restriction does not apply to agreements made in connection with the sale of a business, further demonstrating that Louisiana's strong public policy concerns employment contracts, not the sale of a business. *Id*. at *7.

The Court continues to hold the view expressed in *Gulf Fleet*, especially in the absence of any clear Louisiana state court opinion to the contrary. In this case, the Debtor and Adreima negotiated the sale of the business at arm's length, for valuable consideration, and without any allegation of coercion or adhesion. They were free to choose not only the terms of their agreement but the law applicable to it. They chose to include relatively broad restrictive covenants and to apply the law of Delaware, and the Court finds that these agreements, in the context of the sale of a business, do not violate the public policy of Louisiana. Accordingly, the Court will apply Delaware law, not Louisiana law, to the interpretation of the restrictive covenants, and will not nullify the restrictive covenants under Louisiana law.

Nowhere does the Debtor argue that the restrictive covenants are invalid under Delaware law, the law chosen by the parties, and the Court cannot find any reason to invalidate them under that law. The Court must now determine, as a matter of fact, whether the Debtor breached the valid restrictive covenants, which was the focus of the hearing on the Debtor's Objection.

### THE HEARING AND THE COURT'S FINDINGS OF FACT

Following the parties' legal arguments on the applicable law and CGP's standing, the hearing's focus turned to the factual questions of whether the Debtor had violated the restrictive covenants, and if so, the damages for such violation. The Court heard testimony by the Debtor, Landry, Hughes, and Ryan McCabe, Adreima's Vice President of Financial Planning and Analysis. The corporate depositions of Willis Knighton and Texas Spine were also admitted into evidence. The Court has carefully considered all the evidence and will summarize its findings on the remaining issues below.

18

<u>Validity of the Claim</u>

Based on the testimony and record evidence, the Court makes the following findings regarding the Debtor's breach of the restrictive covenants:

- The Court finds that there is no credible evidence that the Debtor violated the restrictive covenants by directly competing with Adreima, soliciting Adreima's customers, or soliciting Adreima's employees to leave.

- The Court finds credible Landry's and Hughes' testimony that the Debtor played no role in Landry and Hughes leaving Adreima and no role in signing up Willis Knighton and Texas Spine for Avail.

- The Court further finds, based on the testimony of Landry and Hughes and the evidence admitted at the hearing, including transcripts from corporate depositions of Willis Knighton and Texas Spine,[8] that both Willis Knighton and Texas Spine were unhappy with Adreima's service and pricing following Adreima's purchase of the businesses. Both companies had been contracting with Adreima for one-year terms and therefore were free to terminate their relationship with Adreima on relatively short notice.

- The Court finds that the Debtor was not involved with Avail except for providing the $250,000 loan to Landry that enabled Landry to start Avail and later providing additional cash to help with Avail's operations. The Debtor had no role in the management or operation of Avail, no role in soliciting customers for Avail, and no equity or other interest in Avail.

- However, the Court finds that even if the Debtor's extending a loan and giving cash for operations to Landry was motivated by a purely personal desire to help his friend, the funds the Debtor provided unquestionably constitute "financing a competitor," especially considering the Debtor knew Landry intended to use the $250,000 loan to start Avail to compete

---

[8] *See* Plaisance Exhibits 5 (Willis Knighton deposition) and 6 (Texas Spine deposition) (ECF #116).

with Adreima. That is just as true for the funds the Debtor provided to assist Avail's operations once it was already in business as a competitor of Adreima.

Based on all the above findings, the Court finds and concludes that the Debtor violated the restrictive covenants not to finance a competitor, which the Court has already concluded are not nullified by Louisiana law and are viable under Delaware law. The Debtor did not violate the other restrictive covenants, however, because he did not directly compete with Adreima or solicit customers or employees of Adreima.

Having determined that the Debtor breached the restrictive covenants in this way, the Court must address two remaining issues: whether the Debtor's breach is excused by Adreima's alleged prior breach of the sale agreements, and, if not, what the proper measure of damages is for the Debtor's breach.

The Debtor argued in its post-hearing brief (ECF #99) that if the restrictive covenants are not invalidated by Louisiana law, the Court should still refuse to enforce them under Delaware law on the ground that Adreima materially breached the business sale agreements before the Debtor breached the restrictive covenants. Specifically, the Debtor argues that in the negotiations prior to the sale, Adreima agreed to maintain the current staffing to service clients at the same level and to maintain certain financing arrangements. After the sale, the Debtor contends, Adreima went back on its word, causing business problems and leading the Debtor to lose the opportunity for a $1 million payout, which constitute a material breach of the agreements.

The Court rejects the Debtor's argument on two grounds. First, as Adreima correctly pointed out in its post-hearing brief (ECF #113), the Debtor's argument does not concern Adreima's breach of any written agreement but rather the alleged breach of statements made during negotiations. (ECF #113, p. 9-10). The problem for the Debtor is that § 10.4 of the Asset Purchase Agreement specifically states: "This Agreement, together with other Transaction Documents, constitutes the complete agreement and understanding among the Parties regarding the subject matter of this Agreement and supersedes any prior understandings, agreement or representations

20

(including that certain letter of intent dated November 21, 2014) regarding the subject matter of this Agreement."[9] The Debtor cannot rely on statements made during negotiations, and he has failed to point to any contractual provision that Adreima materially breached.

Second, Adreima did not raise this argument until its post-hearing brief, which could be construed as a waiver. The table of contents to Adreima's Objection (ECF #62) lists a section titled "If Delaware law applies, Adreima's entering into the contract in bad faith [p]recludes any enforcement of a non-compete agreement," but there is no such section in the text. At the hearing, although the parties certainly addressed facts concerning Adreima's customer service, the issue of whether Adreima materially breached any contract provision was not squarely presented. In short, the Debtor has failed to point to any contractual provision that Adreima is alleged to have breached, but even if he had, he failed to develop facts tending to show that Adreima materially breached them so as to excuse his own breach of the restrictive covenants.

<u>Damages</u>

This leaves the Court with only one task: determining the amount of Adreima's claim by assessing damages for the breach of the restrictive covenants.[10] Just as it did with respect to establishing the validity of its claim, Adreima has the burden of proving the amount of its claim. *See In re Tran*, 369 B.R. 312 (Bankr. S.D. Tex. 2007) (citing *Matter of O'Connor*, 153 F.3d 258, 260-61 (5th Cir. 1998)). As Adreima correctly notes,[11] the Court has broad discretion to determine damages. *See Neal v. Saga Shipping Co.*, 407 F.2d 481, 489 (5th Cir. 1969) ("There is no requirement that

---

[9] (ECF #115-1, Adreima Exh. 1).

[10] Prior to the hearing, the Court was under the impression that the focus would be on the validity of Adreima's claim rather than damages, as the vast majority of the briefing by both parties focused on whether the Debtor had breached the restrictive covenants by either directly competing with Adreima or by financing a competitor. Moreover, the witness and exhibit lists by both parties did not list expert testimony or otherwise indicate that the parties would address damages. However, on the day of the hearing, it became clear that Adreima intended to put on a damages case as well. During an in-chambers status conference, the Court raised the possibility of deferring the hearing on damages to a later date, but both parties chose to move forward and complete the hearing on both the validity of the claim and potential damages.

[11] *See* Adreima Post-Trial Brief, p. 2 (ECF #113).

. . . a trial court, sitting as trier of fact, itemize the components that enter into an award of damages. . . . Another trier of fact might properly have used a method slightly different from the one the trial court did. He might well have fixed the damages at more or less than the amount that served as a basis for the award here. Neither judge nor jury is expected to be infallible in such matters. The standards by which damages are determined leave room for the play of judgment and discretion of the type properly exercised by the trial court."); *In re Trendsetter HR L.L.C.*, 949 F.3d 905, 914 (5th Cir. 2020) (reviewing a damages award for clear error).

Adreima's POC is in the amount of $11,271,196. This amount is based solely on inadmissible hearsay evidence—the Phoenix Letter prepared by Richard Szekelyi. Adreima did not call Szekelyi as a witness but instead tendered McCabe as an expert in mathematics and financial prediction/forecasting despite the fact he had not written the Phoenix Letter (though he had supplied some information used in it) and was not familiar with many of the issues necessary to prove valuation. The Court did not accept McCabe as an expert and did not give credence to any expert opinions he may have stated or repeated from the Szekelyi letter. However, the Court did accept his testimony as that of a lay witness knowledgeable about his job with Adreima in the field of financial planning and analysis who had helped prepare information for Szekelyi. McCabe had worked for Adreima and its related companies since at least 2013, and he certainly had personal knowledge of the company's finances, including the history of revenues and profits from Adreima's relationships with Willis Knighton and Texas Spine.[12] The Debtor had no expert or other such witness ready to directly

---

[12] The Debtor maintains in his post-hearing brief that McCabe, as a lay witness, was not qualified under Fed. R. Evid. 701 to testify as to damages. The Court agrees that McCabe was not qualified to testify as to a speculative damages model, which would require expert testimony. However, he was qualified to testify as to Adreima's past business, including past revenues and profits, based on Adreima's business records, which the evidence shows he prepared, and the Court's Ruling is based only on facts as to which McCabe was qualified to testify. In other words, the Court is not evaluating any of McCabe's testimony as that of an expert under Fed. R. Evid. 701. Rather, the Court is evaluating his testimony under Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. . . .").

address damages, though some of the testimony by the Debtor, Landry and Hughes rebutted Adreima's damages evidence.

Based on the testimony and the record in this matter, the Court finds that it is appropriate to award some degree of damages for the Debtor's breach, but Adreima has grossly overstated its claim. Adreima's damages calculation is based on allegedly much more egregious behavior by the Defendant (direct solicitation of Adreima customers and employees, founding a competing business, and the like) which the evidence and testimony established to be false. The Debtor breached only the provision prohibiting the financing of a competitor of Adreima, not by directly competing with Adreima, hiring away Adreima employees, or enticing customers away from Adreima.

Moreover, with respect to the primary component of Adreima's damages, the loss of future profits, Adreima's damages model rests on the assumption that but for the Debtor financing Avail, Willis Knighton and Texas Spine would have remained Adreima customers for at least as long as they had already been customers: 15 years of projected future profits for Willis Knight and eight years of projected future profits for Texas Spine. The Court finds that assumption to be unreasonable and not supported by the testimony or record evidence. Adreima's assumption as to potential lost years of profits appears particularly questionable since the restrictive covenants were set to expire approximately two years after Willis Knighton and Texas Spine began using Avail's services.

Finally, both Willis Knighton and Texas Spine had only recurring one-year contracts with Adreima at the time they left, allowing either one to terminate Adreima's services on relatively short notice. Based on credible testimony at the hearing and record evidence, including transcripts of their corporate depositions, the Court finds that Willis Knighton and Texas Spine were unhappy with Adreima's pricing and/or customer service, and those customers may well have left Adreima for another competitor at any time. There is no evidence that Avail offered any special enticement for Willis Knighton and Texas Spine to leave Adreima other than better pricing and customer service, and no evidence that the Debtor was involved at all in

23

luring the customers away from Adreima. The Court finds that both Willis Knighton and Texas Spine could have and may have terminated Adreima's services at any time even if Avail did not exist. The Court therefore concludes that Adreima is not entitled to damages for the entire anticipated future loss of income from those customers based on an assumption that they would have remained customers of Adreima for at least as long as they had already been customers of Adreima (and the companies previously operated by the Debtor).

On the other hand, the Debtor unquestionably breached the restrictive covenants by financing Avail, and the customers in question left Adreima for Avail. They could not have defected to Avail at that time if the Debtor had not helped Avail with startup financing and some later financial assistance.

Under the circumstances, particularly the lack of both credible evidence that Willis Knighton and Texas Spine would have remained clients of Adreima indefinitely and credible projections of lost profits over an extended time period, the Court will award one year of lost profits for the loss of Willis Knighton's and Texas Spine's business. Adreima's witness, McCabe, testified that for the business that Adreima lost to Avail, in the year prior to that defection, Adreima had invoiced Willis Knighton approximately $1,200,000 and Texas Spine $405,000. He also testified that Adreima's profits on these revenues were $640,000 and $220,000 respectively. Thus, the Court finds Adreima's damages for the Debtor's breach of the agreement to be $860,000, the lost profits for one year.

Adreima also seeks $300,000 in damages for breach of the Goodwill Purchase Agreement and $148,000 for breach of the Consulting Agreement. Adreima fails to explain why it should get all its money back for these agreements despite getting damages for the actual loss of business. The evidence shows that the Debtor did nothing other than finance a competitor. There is no evidence that he disparaged Adreima to competitors, solicited employees, directly competed, or otherwise violated the spirit of the Goodwill Purchase Agreement—other than by financing a competitor in violation of the letter of the restrictive covenants. The Court finds that the requested remedy of getting back the entire $300,000 paid for the Goodwill Purchase

24

Agreement is unreasonable, and that the award of damages for the future lost profits is sufficient. The restrictive covenants were the same in all three contracts, and the Court finds that a single damages award tied to the conduct at issue is most reasonable. Similarly, there is no suggestion that the Debtor failed to perform the consulting services called for by the Consulting Agreement, and imposing damages beyond the award of future lost profits would go beyond remediation and into the realm of punitive damages. Adreima has proved damages for the loss of future profits, but no more.

The Court also declines to award damages for the loss of employees to Avail. Testimony at the hearing, which the Court finds to be credible, established that many of Adreima's employees were unhappy there. Whether they left of their own accord or were fired, there is no evidence showing those employees left solely due to the Debtor financing Avail, and they likely would have left anyway. Thus, the Court finds that Adreima did not prove damages for the loss of those employees, and it is Adreima's burden to do so. Finally, although Adreima refers to other potential categories of damages in its brief, the Court finds that those were not sufficiently supported by record evidence.

In sum, based on all of the above, the Court concludes that the only reasonable damages to which Adreima is entitled, and for which it provided sufficient evidence at the hearing, are those relating to the loss of one year of future profits for Willis Knighton's and Texas Spine's business, in the total amount of $860,000.

## CONCLUSION

The Court concludes that the Debtor's Objection should be granted in part and denied in part, and that Adreima's claim shall be allowed in the amount of $860,000 for the Debtor's violation of the restrictive covenants by financing a competitor. The Debtor shall submit to the Court an Order in accordance with this ruling within ten (10) days from its entry.